1   EDUARDO A. CALVO
2   WILLIAM N. HEBERT
    SHANE A. INTIHAR
3   CALVO & CLARK, LLP
    259 Martyr Street, Suite 100
4   Hagåtña, Guam 96910
5   Tel: (671) 646-9355
    Fax: (671) 646-9403
6
7   *Attorneys for Plaintiffs*
    Watts Constructors, LLC and
8   Watts-Healy Tibbitts A JV
9
10
11
12                      **IN THE UNITED STATES DISTRICT COURT**
                                **DISTRICT OF GUAM**
13
    WATTS CONSTRUCTORS, LLC, an Iowa        Civil
14  limited liability company, and          Case No. **10-00002**
    WATTS-HEALY TIBBITTS A JV, a joint
15  venture,
16          Plaintiffs,                     **COMPLAINT FOR DECLARATORY**
                                            **AND INJUNCTIVE RELIEF**
17          v.
18
    PORT AUTHORITY OF GUAM, a Guam
19  public corporation,
20          Defendant.
21
22
23
24
25
26
27
28

    365702                          ORIGINAL

Plaintiffs Watts Constructors, LLC ("Watts") and Watts-Healy Tibbitts A JV (the "Joint Venture" and collectively with Watts, "Plaintiffs") allege as their complaint against Defendant Port Authority of Guam ("Defendant" or the "Port") as follows:

## INTRODUCTION

1.     This is an action to prevent the imposition and collection of unauthorized tariffs, fees, operating expenses and fines imposed by the Port on the Joint Venture and its two members, Watts and Healy Tibbitts Builders, Inc. ("Healy Tibbitts"), as well as upon Healy Tibbitts' shipping agent and the owner of the tug boat at issue in this dispute.  By asserting the right to impose tariffs on the loading and transportation of all goods which pass through Guam's Apra Harbor, the Port has overstepped the authority granted it by the legislature, and has violated the Plaintiffs' rights under federal and territorial law. In particular, the Port has attempted to impose tariffs, fees, operating expenses and fines on the Plaintiffs for load-out operations that did not occur on or near Port facilities or any other Guam governmental facilities and which did not involve Port personnel except in one instance when the Port forced the Plaintiffs to use Port personnel under Port-imposed economic duress.  Both of the load-out operations at issue here occurred at the Guam Shipyard which is located in Apra Inner Harbor, which is not located on or near Port facilities.   The U.S. Navy physically controls access to Apra Inner Harbor.   Plaintiffs seek injunctive and declaratory relief preventing the collection and imposition of these unauthorized tariffs, fees, expenses and fines.

## THE PARTIES

2.     Watts is a limited liability company organized and existing under the laws of Iowa. Watts is a contractor licensed to do business in the Territory of Guam.

3.     Watts-Healy Tibbits A JV is a joint venture governed by the laws of Delaware. Watts and Healy Tibbitts are the sole members of the Joint Venture.  Watts is the Joint Venture's Managing Party.  Weeks Marine, Inc. supplied the U.S. hull tug and Healy Tibbitts supplied the U.S. hull barge to the Joint Venture, which were involved in the events leading up to this dispute. Healy Tibbitts retained Norton Lilly International, Inc. ("Norton Lilly") as its shipping agent.

1

Watts, Healy Tibbitts, the Joint Venture, Weeks Marine, Inc. and Norton Lilly are collectively referred to as the "Joint Venture-Related Parties."

4.    Defendant Port is a public corporation and autonomous instrumentality organized and existing under the laws of the Territory of Guam.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and it is between citizens of different States; pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the Constitution, laws, or treaties of the United States; pursuant to 28 U.S.C. § 1333 because it is a civil case of admiralty or maritime jurisdiction; and pursuant to 28 U.S.C. § 1343 because it is a civil action authorized by law to be commenced to recover damages for injury to one's person or property and to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over all other claims that are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6.    This Court has jurisdiction over Plaintiffs' claim for declaratory relief and judgment under 28 U.S.C. § 2201 because it is a case of actual controversy within the Court's jurisdiction and Plaintiffs are interested parties seeking a declaration of their rights and legal relations with the Port.

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because this is a civil action not founded solely on diversity of citizenship and the defendant resides in this judicial district or this is the judicial district in which a substantial part of the events or omissions

2

giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## GENERAL ALLEGATIONS

### The Pearl Harbor Project

8.      Watts is engaged in the business of large construction projects for private and public entities. Watts entered into the Joint Venture with Healy Tibbitts in order to bid on, and complete, certain construction projects in Hawaii.

9.      On August 11, 2008, the Joint Venture entered into a contract with the Department of Defense to construct a submarine drive-in magnetic silencing facility for the U.S. Navy at Beckoning Point, Pearl Harbor, Hawaii (the "Pearl Harbor Project"). The technical requirements for the pier called for the construction materials to be non-magnetic, including the concrete. Aggregates from Guam were determined to have the necessary non-magnetic properties and to be suitable for the concrete to be used in pilings and pre-cast planks for the pier. Watts operates a pre-cast yard (the "Pre-cast Yard") near the back gate to the Guam Naval Base. Watts planned to cast the piles and planks on Guam and barge them to Pearl Harbor in two shipments. The first shipment was scheduled to set sail in late July or early August 2009. The second shipment was scheduled to set sail in November 2009.

10.     The pre-cast concrete materials included piles, planks and Z-loop blocks. There were 232 piles, 102 planks, and 57 Z-loop blocks. The largest of the piles was 140 feet long and weighed 36.4 tons. All of the pre-cast concrete materials were cast by Watts. Title to the pre-cast concrete materials transferred to the U.S. Navy when the U.S. Navy made certain progress payments to the Joint Venture pursuant to the contract between the Joint Venture and the Department of Defense and, in particular, pursuant to the contract's Progress Payment Clause. Accordingly, the U.S. Navy owned all of the pre-cast concrete materials prior to the commencement of the load-out operations discussed herein.

3

**The Joint Venture's Search for a Suitable Facility
on Guam to Load the Pre-Cast Concrete Materials**

11.     In preparation for loading the pre-cast materials onto a barge on Guam for shipment to Pearl Harbor, the Joint Venture sought a facility on Guam that could safely and timely handle the load-out and identified three possible facilities adjacent to Apra Harbor: Naval Base Guam, the Port, and the Guam Shipyard. The Joint Venture required a staging area for the materials for a period of at least two weeks before loading, a safe transportation route from the Pre-cast Yard to the staging area, adequate loading facilities, such as cranes and other equipment to handle the large and unwieldy loads, and sufficient personnel, including stevedores, to conduct the load-out.

12.     With respect to Navy Base Guam, the Joint Venture received the assistance of U.S. Navy civilian personnel from the Naval Facilities Engineering Commands in Pearl Harbor and Guam to help determine which wharf at Navy Base Guam, if any, would accommodate the load-out. Although several wharves were considered (including the Sierra, Tango, Uniform and Victor wharves), because none of these wharves possessed an adequate staging area where the materials could be collected and stored in preparation for the load-out and thus would have necessitated repeated re-handling of the pre-cast material cargo, Naval Base Guam was ultimately rejected as a possible load-out site.

13.     Beginning in March of 2009, the Joint Venture made inquiries to the Port about its capacity to handle the load-out. However, after reviewing the Port's facilities and discussing logistical concerns with Port personnel, the Joint Venture determined that the load-out could not be timely and safely carried out using the Port's facilities, equipment or personnel. The Joint Venture presented the Port with its assessment that the Port was unable to safely load-out the materials in question and that the Port was unable to provide an adequate lay down area in which to stage the load-out. After inspecting the pre-cast materials, the Port conceded that the project presented a logistical challenge, and that the Joint Venture had legitimate concerns about safety, transportation, convenience and lift capacity. In addition to the fact that the Port never adequately addressed the Joint Venture's concerns that the Port could not safely and timely load the materials from its wharves, the Port **never** provided the Joint Venture with an engineering

analysis for the loads in question, a proposed plan of operation, or a price proposal to perform the load-out under consideration.

14.     The Port, its wharves, and the other public facilities of the Port, are located on the north side of Apra Harbor on Cabras Island. Apra Inner Harbor, where the Guam Shipyard is located, is located south of and is geographically separate and distinct from the rest of Apra Harbor, and is entirely within the control of the U.S. Navy.

15.     After reviewing the available wharves in and around Apra Harbor, the Joint Venture selected the November wharf located at the Guam Shipyard and Healy Tibbitts, acting for the Joint Venture, entered into an agreement with the Guam Shipyard to use its facilities and personnel to conduct the load-out of the cargo owned by the U.S. Navy. The Joint Venture selected the November wharf because it was nearest to the Pre-cast Yard where the pre-cast concrete materials were made, which obviated the need to transport the pre-cast materials (including pilings nearly half a football field in length) on Guam Highway 1 or to close any public roads, as would be required if the Port's wharves were used. In addition, the Guam Shipyard had an adequate staging area that could be used for two weeks before the load-out, it employed sufficient personnel to conduct the load-out, and it had adequate cranes and loading equipment; all of which meant that the load-out could proceed for two weeks without any interruption.

16.     The Guam Shipyard is a private facility that subleases the November wharf from the Guam Economic Development Authority which leases the property from the U.S. Navy. The November wharf is located in Apra Inner Harbor, which is located south of Apra Harbor on Orote Peninsula and is controlled by the U.S. Navy. A map depicting an area including Apra Harbor and Apra Inner Harbor and which identifies the respective locations of the Port facilities and the November wharf is appended as Exhibit A. Access to Apra Inner Harbor is controlled by various security gates operated by the U.S. Navy. The Port of Guam owns and controls no facilities inside Apra Inner Harbor.

5

## The First Load-out from Guam Shipyard in July-August 2009

17.     Weeks Marine, Inc. supplied a U.S. hull tug, the THOMAS, and Healy Tibbitts supplied a U.S. hull barge, the BRUSCO 401, to transport the pre-cast concrete materials to Pearl Harbor.  Both the THOMAS and the BRUSCO 401 are registered with the Department of Homeland Security and U.S. Coast Guard and possess both coastwise and registry endorsements which permit them to ship goods between Guam and the U.S. mainland.  On July 27, 2009, Healy Tibbitts' shipping agent, Norton Lilly, filed with the Port's Harbor Master its Notice of Arrival and Agencyship.  On the same day, the Port's Harbor Master executed the Notice of Arrival and Agencyship submitted by Norton Lilly.  This notice stated that the tug and barge would enter Apra Harbor at approximately 1800 hours on July 30 and dock at the "November Pier/Navy" for the purpose of loading cargo.

18.     On July 30, 2009, the tug and barge arrived offshore of Guam and the next day the pilot and assist tug met the THOMAS and the BRUSCO 401 and proceeded to November wharf.  The tug and barge were cleared by Guam Customs and Quarantine Agency at the Lima wharf, also located at the Guam Shipyard, the same morning.  By August 12, 2009, all cargo was loaded on board the BRUSCO 401.  Thereafter, Guam Customs and Quarantine Agency issued a Departure Clearance of Vessel for both the THOMAS and the BRUSCO 401.  On August 14, 2009, the tug and barge set sail for Pearl Harbor without the Port imposing any charges.  The tug and barge safely transported and offloaded the pre-cast concrete materials at Pearl Harbor and soon thereafter set sail to return to Guam to pick up the second load.

## The Port's Refusal to Permit the Joint Venture's Vessels to Pass Through Apra Harbor to Receive a Second Load in November 2009 Until Watts Paid Imputed Charges for the First Load-Out

19.     On November 2, 2009, the THOMAS and the BRUSCO 401 arrived offshore of Guam, but the Port refused to allow the vessels to pass through Apra Harbor in order to enter Apra Inner Harbor and dock at Guam Shipyard until the Joint Venture paid the imputed cost of moving the first load of cargo in July-August 2009.  There is no provision in the Port's Tariff Schedule, Regulations, or Rules which allow for a retroactive demand by the Port for imputed charges, fees, and tariffs.

6

20.     On November 5, 2009, the Port sent a letter to Norton Lilly, Healy Tibbitts' shipping agent, regarding the BRUSCO 401's July-August voyage. The Port claimed that it had discovered that the cargo load-out in July-August occurred at the Guam Shipyard. The Port also stated that, "[a]ccording to the Port enabling act, '[t]he Port is an Autonomous Instrumentality of the Government of Guam, which shall provide for the needs of ocean commerce, shipping, recreational and commercial boating, and navigation of the territory of Guam.'" Even though the Port had no involvement in the actual load-out of the pre-cast concrete materials in July-August 2009, the Port enclosed invoice number 74704, which was an assessment for the cargo operations of the BRUSCO 401's first voyage in the amount of $88,808.03. The Port demanded payment upon the Joint Venture's receipt of the invoice and stated that it would not proceed with the Joint Venture's request to allow the barge to pass through Apra Harbor in order to enter Apra Inner Harbor to load cargo until the billing for the first load-out was fully paid.

21.     The Joint Venture was forced to pay the full bill for $88,808.03 to the Port in order to gain the Port's permission for the Joint Venture's tug and barge to pass through Apra Harbor so that they could access Apra Inner Harbor and receive the second cargo of pre-cast concrete materials for the Pearl Harbor Project. If the Joint Venture had not paid the full amount that the Port alleged was due and owing, the Port would have refused passage of the Joint Venture's tug and barge through Apra Harbor, which would have delayed the Joint Venture's work on the Pearl Harbor Project for an untold number of days or weeks. The Joint Venture was, and currently is, facing the assessment of liquidated damages from the U.S. Navy arising from the delay (caused by the Port) in the shipment of critical materials needed to complete the Pearl Harbor Project.

22.     On November 6, 2009, Watts, on behalf of the Joint Venture, paid the Port $88,808.03. Plaintiffs did not voluntarily pay this amount to the Port and, as discussed below, have filed a written notice protesting this payment.

23.     At a special meeting of the Port's Board on November 7, 2009, the Port's Board approved an arrangement whereby the Port would permit the Joint Venture to load the barge at the Guam Shipyard but would require the Joint Venture to permit Port personnel to participate in

the load-out. Aside from this one requirement, the load-out would otherwise proceed in the manner as contracted by Healy Tibbitts (acting on behalf of the Joint Venture) and the Guam Shipyard, using a mixture of Guam Shipyard and Healy Tibbitts equipment and personnel. Under this arrangement imposed upon the Joint Venture by the Port, the Port would assess its fees based on the services provided and the work performed by the Port. Because the Port would not otherwise permit the Joint Venture's vessels to pass through Apra Harbor, the Joint Venture was forced to accept this arrangement. After the Joint Venture acceded to the Port's demand, on November 9, 2009, the Port permitted the tug and barge to pass through Apra Harbor. Thereafter, the vessels entered Apra Inner Harbor and docked at the Guam Shipyard in preparation for loading.

**The Port Imposed a $2,500 Fine on Norton Lilly for Alleged Conduct that Never Occurred**

24.    On November 12, 2009, the Harbor Master of the Port caused to be hand-delivered to Healy Tibbitts' shipping agent, Norton Lilly, a "Notice of Violation of Section 5.2 of the Port Authority of Guam's Harbor Regulations on July 31, 2009 at 0852 hours by the vessel Thomas/Barge 401, Voyage Number 209, arriving at July 31, 2009." The Port fined Norton Lilly $2,500 for this alleged violation that had occurred three and one-half months earlier. Watts and Norton Lilly have protested this fine, because the Port granted permission for the tug and barge to enter the harbor on July 31, 2009.

**The Port Demanded that Plaintiffs Pay the Port Nearly $1 Million as a Condition of Releasing the Vessels and the U.S. Navy's Materials for the Pearl Harbor Project**

25.    On November 23-24, 2009, the Port issued three invoices to Norton Lilly covering the first and second voyages for a total of $927,178.50. The first invoice (No. 44820) was for demurrage charges for the July-August load-out in the amount of $448,221 (after deducting the $88,808.03 Watts had already paid for imputed but never provided "operations") and also included the $2,500 fine for the November 12, 2009 "Notice of Violation" issued to Norton Lilly for the July-August harbor entry of the BRUSCO 401. The second invoice (No. 44821) was for demurrage charges for the November load-out in the amount of $308,496.

8

The third invoice (No. 74779) was for "operations" for the November load-out in the amount of $170,461.50.

26. Although the Port granted Plaintiffs fifteen days to review these invoices, it nevertheless demanded payment of the full amount of $927,178.50 before it would allow the BRUSCO 401 to leave the harbor on its second voyage.

27. As the Port was demanding payment and Plaintiffs were negotiating for the release of the BRUSCO 401, Typhoon Nida was approaching Guam. For the safety of the vessels, their cargo and their crew, Watts pleaded with the Port to allow the tug and barge to set sail for Hawaii in advance of the anticipated landfall of Typhoon Nida. The Port refused to permit the vessels to pass out of Apra Harbor until Watts had paid the full amount billed by the Port. Watts offered to provide the Port with a letter of credit ("LOC") drawn on the Bank of Hawaii, the Joint Venture's bank, but because it was Sunday in Hawaii Watts could not obtain an LOC before the ship needed to set sail ahead of the typhoon. Watts offered instead to provide the Port with a check as security for the subsequent delivery of the LOC, with the Port's agreement that it would not cash the check but would instead exchange the check for the LOC. The Port agreed.

28. On November 23, 2009, Watts delivered, on behalf of the Joint Venture, a check to the Port in the amount of $924,678.50 (which represented the full amount of $927,178.50 billed by the Port, less $2,500 representing the fine imposed without basis upon Watts and which Plaintiffs decided to appeal). The Joint Venture delivered the check to the Port as security for the subsequent delivery of the LOC for the sole reason that the Port would not otherwise permit the tug and barge to depart from Guam. The Joint Venture had to deliver the check to the Port to obtain the release of its vessels in order to avoid defaulting on a major U.S. Navy contract and to allow the vessels to depart Guam prior to the threatened landfall of Typhoon Nida.

29. On November 30, 2009, Watts, acting on behalf of the Joint Venture, delivered the LOC to the Port and requested return of the check. The Port refused. Watts informed the Port it would stop payment on the check and did so on November 30. On December 2, 2009, the Port tried to cash the check. The Port still holds the LOC, of which it is the beneficiary in the

amount of $924,678.50, pending agreement of the parties to release some or all of the funds or a final adjudication of this dispute.

30.     On November 30, 2009, pursuant to Section 1.8 of P.L. 26-72, Watts and Norton Lilly submitted a written appeal of the Notice of Violation issued to Norton Lilly on November 12, 2009 and the $2,500 fine imposed on Norton Lilly for allegedly allowing the THOMAS and the BRUSCO 401 to enter the harbor without permission on July 31, 2009. A copy of this appeal is appended as Exhibit B.

31.     On November 30, 2009, Watts submitted a written protest and notice of dispute regarding unlawful tariffs (set forth in Invoice Nos. 74704, 44820, 44821 and 74779) assessed on Norton Lilly by the Port. Watts notified the Port that it was disputing the imposition of the tariffs on Norton Lilly, because they were imposed without lawful authority to do so and the charges were arbitrary and without any reasonable basis. A copy of this written protest and notice of dispute is appended as Exhibit C.

32.     Plaintiffs have standing to challenge these charges because Plaintiffs have been injured by the Port's conduct. According to Section I, Item No. 1, Paragraph (e) of the Port's Terminal Tariff: "Whenever any vessel under the terms of these rules shall become obligated to pay any sum of money for any purpose whatsoever, the owner, charterer, agent, master, operator, possessor and person in whose service the vessel is operated or maintained shall be jointly and severally liable for the payment of such sums." The Port, therefore, takes the position that the Joint Venture, which is a "person in whose service the vessel is operated," is jointly and severally liable for the payment of the tariffs and fines it has imposed on Norton Lilly and/or Healy Tibbitts and has sought to recover these sums from co-venturer Watts.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief – Unauthorized Imposition of Tariffs)

33.     Plaintiffs repeat and reallege paragraphs 1 through 32 above as though fully set forth in this claim for relief.

10

34.     The Port's enabling statute authorizes the Port to establish "rates, dockage, rentals, tolls, pilotage, wharfage and charges for the use and occupation of **public facilities and appliances of the Port**." 12 G.C.A. § 10104(j) (emphasis added).

35.     Plaintiffs did not use or occupy the public facilities or appliances of the Port.

36.     The Guam Shipyard is not a public facility or appliance of the Port.

37.     The Port is a commercial enterprise which "collect[s] as its revenue the **Terminal Tariff**, as approved by the Port Board." 12 G.C.A. § 10311 (emphasis added).

38.     The Terminal Tariff "appl[ies] on all **freight received at the terminal or wharves of the Port**." Port Terminal Tariff, Section I, Item No. 1, Paragraph (b) (emphasis added).

39.     Plaintiffs did not use the terminal or wharves of the Port.

40.     The Guam Shipyard is not located adjacent to or near the terminal or wharves of the Port.

41.     There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and the Port denies that (a) the Port's authority to impose fees and tariffs does not extend beyond the Port's own facilities, and (b) the Port's imposition of the fees and charges alleged above are unlawful and unauthorized.

42.     Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief – Unauthorized Imposition of Fine)

43.     Plaintiffs repeat and reallege paragraphs 1 through 42 above as though fully set forth in this claim for relief.

44.     There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and

the Port denies that the Port unlawfully and without authorization imposed a fine of $2,500 on Norton Lilly for the entry of the THOMAS and BRUSCO 401 into Apra Harbor on July 31, 2009, when in fact the vessels had received the Harbor Master's permission to enter Apra Harbor.

45. Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

## THIRD CLAIM FOR RELIEF

### (Declaratory Relief – No Contract, Obligation or Duty to Use Port Facilities)

46. Plaintiffs repeat and reallege paragraphs 1 through 45 above as though fully set forth in this claim for relief.

47. Watts and the Port did not agree on any material term of an agreement, such as pricing, schedule, or scope of work, which would have obligated Watts to use the Port's facilities. The Port imposed tariffs and fees upon Norton Lilly for the first load-out in the amount of $448,221 on the grounds that a staging area was cleared by the Port ten days prior to the arrival of the BRUSCO 401 in Apra Harbor and that the Port would have provided certain breakbulk (storage and load-out) services to the Joint Venture prior to the BRUSCO 401's departure on August 14, 2009 had the Joint Venture conducted a load-out at the Port's facilities. On information and belief, the Port imposed these charges on Norton Lilly because the Port contends that the Joint Venture promised or agreed to use the Port's facilities for the first load-out. Therefore, the Port's invoice in the amount of $448,221 was intended to make Watts, as a member of the Joint Venture, reimburse the Port for its imputed losses and/or to compensate the Port for the tariffs it expected to impose on the Joint Venture.

48. There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that the Port contends, and Plaintiffs deny, that Plaintiffs or any of the Joint Venture-Related Parties ever promised or agreed to use the Port's facilities for the first load-out occurring in July-August 2009 and,

12

accordingly, if the Port set aside wharf-side space for staging the pre-cast concrete materials and held ready Port-employed stevedores to conduct the load-out, or if the Port expected to impose any tariffs on Watts or any other party in conjunction with a load-out at its facilities, the Port acted unreasonably and without justification, and none of the Joint Venture-Related Parties has any legal duty to reimburse the Port for any costs it incurred or any revenue it has foregone or to pay any expectation or contract-related fees or damages to the Port.

49.     Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

## FOURTH CLAIM FOR RELIEF

### (Declaratory Relief - Violation of 46 U.S.C. § 60307)

50.     Plaintiffs repeat and reallege paragraphs 1 through 49 above as though fully set forth in this claim for relief.

51.     Title 46 U.S.C. Section 60307 states that:

A vessel with a registry endorsement or a coastwise endorsement, trading from one port in the United States to another port in the United States or employed in the bank, whale, or other fisheries, is exempt from tonnage taxes and light money.

52.     The Port imposed tariffs on some or all of the Joint Venture-Related Parties even though the Port provided no services to any of the Joint Venture-Related Parties.  As such, the fees or tariffs imposed by the Port on any or all of the Joint Venture-Related Parties constitute a tonnage tax.

53.     Both the THOMAS and the BRUSCO 401 are registered with the Department of Homeland Security and the U.S. Coast Guard and possess valid coastwise and registry endorsements which permit the THOMAS and the BRUSCO 401 to engage in the shipment of goods between Guam and the U.S. mainland and which exempt the THOMAS and the BRUSCO 401 from the imposition of any and all tonnage taxes.

54.     Accordingly, the Port violated 46 U.S.C. § 60307 when it imposed the above fees or tariffs on any or all of the Joint Venture-Related Parties.

55.     There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and the Port denies (1) that the fees or tariffs the Port imposed on any or all of the Joint Venture-Related Parties constitutes a tonnage tax, (2) that the Port has violated 46 U.S.C. § 60307, and (3) that the Port's continued collection of these fees or tariffs from any or all of the Joint Venture-Related Parties, would violate 46 U.S.C. § 60307.

56.     Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief - Violation of Import/Export Clause of United States Constitution)

57.     Plaintiffs repeat and reallege paragraphs 1 through 56 above as though fully set forth in this claim for relief.

58.     The United States Constitution, Art. I, § 10, Cl. 2 provides: "No State shall, without the consent of Congress, lay any Imposts or Duties on Imports or Exports, except that may be absolutely necessary for executing its inspection Laws. . . ."

59.     There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and the Port denies that the fees imposed by the Port constitute an impost on exported goods and thus a restriction on free commerce and navigation, all in violation of Art. I, § 10, Cl. 2 of the United States Constitution.

60.     Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

14

## SIXTH CLAIM FOR RELIEF

### (Declaratory Relief - Violation of Tonnage Clause of United States Constitution)

61.     Plaintiffs repeat and reallege paragraphs 1 through 60 above as though fully set forth in this claim for relief.

62.     The United States Constitution, Art. I, § 10, Cl. 3 provides: "No state shall, without the consent of Congress, lay any duty of tonnage. . . ."

63.     There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and the Port denies that the fees or tariffs imposed by the Port constitute a tonnage tax imposed by the Port in violation of Art. I, § 10, Cl. 3 of the United States Constitution.

64.     Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Relief – Inorganic and Unconstitutional Taking – 48 U.S.C. §1421b(f) and Takings Clause of the Fifth Amendment to the United States Constitution)

65.     Plaintiffs repeat and reallege paragraphs 1 through 64 above as though fully set forth in this claim for relief.

66.     The Organic Act of Guam, 48 U.S.C. § 1421b(f), provides that, "Private property shall not be taken for public use without just compensation."

67.     The Fifth Amendment to the United States Constitution provides, in relevant part, "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

68.     There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and the Port denies that the Port's charging any or all of the Joint Venture-Related Parties the fees or tariffs as set forth above constitutes an unlawful taking from the Joint Venture-Related Parties so

charged of private property without just compensation in violation of 48 U.S.C. §1421b(f) and the Fifth Amendment to the United States Constitution.

69.     Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

## EIGHTH CLAIM FOR RELIEF

### (Declaratory Relief – Violation of Due Process – Fifth and Fourteenth Amendments to the United States Constitution)

70.     Plaintiffs repeat and reallege paragraphs 1 through 69 above as though fully set forth in this claim for relief.

71.     The Fifth Amendment to the United States Constitution provides, in relevant part, "No person shall . . . be deprived of life, liberty, or property, without due process of law..."

72.     The Fourteenth Amendment to the United States Constitution provides, in relevant part, "No State shall ... deprive any person of life, liberty, or property, without due process of law...."

73.     There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and the Port denies that the Port's charging any or all of the Joint Venture-Related Parties the fees or tariffs as set forth above constitutes an unlawful deprivation of the Joint Venture-Related Parties so charged of private property without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

74.     Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

## NINTH CLAIM FOR RELIEF

### (Declaratory Relief - Violation of Federal Common Law)

75.     Plaintiffs repeat and reallege paragraphs 1 through 74 above as though fully set forth in this claim for relief.

76.     Federal law provides that a port operator shall not assess fees against a vessel docked and moored to a facility in which the port operator has no ownership interest.  A port owner may charge fees only for the use of property that it owns.

77.     There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and the Port denies that because the Port does not own the Guam Shipyard, the Port violated federal common law by imposing fees on any or all of the Joint Venture-Related Parties for using the Guam Shipyard.

78.     Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

## TENTH CLAIM FOR RELIEF

### (Declaratory Relief – Violation of § 1421i(a)
### of the Organic Act of Guam – 48 U.S.C. § 1421i(a))

79.     Plaintiffs repeat and reallege paragraphs 1 through 78 above as though fully set forth in this claim for relief.

80.     The Organic Act of Guam, 48 U.S.C. § 1421i(a), provides that:

> The income-tax laws in force in the United States of America and those which may hereafter be enacted shall be held to be likewise in force in Guam: *Provided,* That notwithstanding any other provision of law, the Legislature of Guam may levy a separate tax on **all** taxpayers in an amount not to exceed **10 per centum** of their annual income tax obligation to the Government of Guam.

(Emphasis added).

81.     The fees or tariffs imposed by the Port on any or all of the Joint Venture-Related Parties constitute a tax in addition to the income tax already levied on Guam.

82. This tax is not imposed in order to defray or cover the costs of any services actually provided to any or all of the Joint Venture-Related Parties by the Port.

83. This tax is not universally levied on *all* taxpayers in Guam, but only upon any or all of the Joint Venture-Related Parties.

84. This tax exceeds ten percent (10%) of any or all of the Joint Venture-Related Parties' respective annual income tax liabilities to Guam.

85. There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and the Port denies that the Port's charging any or all of the Joint Venture-Related Parties the fees or tariffs as set forth above violates 48 U.S.C. §1421i(a) because the fees or tariffs constitute a tax i) that is not universally levied and ii) that is too high.

86. Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

## ELEVENTH CLAIM FOR RELIEF

### (Declaratory Relief – No Agreement to Arbitrate)

87. Plaintiffs repeat and reallege paragraphs 1 through 86 above as though fully set forth in this claim for relief.

88. Plaintiffs have not entered into any contract, either oral or written, to arbitrate their disputes with the Port. Nonetheless, pursuant to Port Board Policy Memorandum No. 2002-09 ("Memo 2002-09"):

> All disputes and controversies of any kind and nature arising out of or relating to this tariff shall be determined by final binding arbitration. Any interested party may demand such arbitration in writing within thirty (30) days after the controversy arises which demand shall include the name of the arbitrator appointed by the party demanding arbitration, together with a statement of the matter in dispute or controversy.

89.     Pursuant to Port Board Policy Memorandum No. 2002-10 ("Memo 2002-10") a party may dispute an invoice charge by giving written notice to the Port within 30 days of the invoice date.  However, "[n]o dispute will be considered until the undisputed portion of the invoice is paid in full."  If a dispute is timely received and the undisputed portion has been paid in full, then the Port "will endeavor to respond" within 60 days.  Finally, pursuant to Memo 2002-10:

> A party dissatisfied with the denial or deemed denial by the Port Authority of a dispute must demand arbitration (pursuant to the arbitration clause Board Policy Memorandum 2002-09) within thirty (30) days of the denial or deemed denial.

90.     On November 30, 2009, in order to preserve its rights and without waiving any right to commence this action, Watts, on behalf of the Joint Venture, gave timely notice to the Port that it contested the charges imposed by the Port.

91.     There exists an actual controversy between Plaintiffs on the one hand, and the Port on the other hand, regarding their respective rights and duties, in that Plaintiffs contend, and the Port denies that the present dispute is not subject to arbitration, because the parties did not enter into a contract or agreement to arbitrate.

92.     Plaintiffs pray that this Court declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201 and that any such declaration have the force and effect of a final judgment or decree, as set forth below.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

1.     On the first claim for relief, for a declaration, judgment and decree that (a) the Port's authority to impose fees and tariffs does not extend beyond the Port's own facilities, and (b) the Port's imposition of the fees and charges alleged above on any or all of the Joint Venture-Related Parties is unlawful and unauthorized;

2.     On the second claim for relief, for a declaration, judgment and decree that the Port unlawfully and without authorization imposed a fine of $2,500 on Norton Lilly or any of the

other Joint Venture-Related Parties for the entry of the THOMAS and the BRUSCO 401 into Apra Harbor on July 31, 2009, when in fact the vessels had received the Harbor Master's permission to enter Apra Harbor;

3.     On the third claim for relief, for a declaration, judgment and decree that none of the Joint Venture-Related Parties ever promised or agreed to use the Port's facilities for the first load-out occurring in July-August 2009 and, accordingly, if the Port set aside wharf-side space for staging the pre-cast concrete materials and held ready Port-employed stevedores to conduct the load-out, the Port acted unreasonably and without justification, and none of the Joint Venture-Related Parties has any legal duty to reimburse the Port for any costs it incurred or any revenue it has foregone;

4.     On the fourth claim for relief, for a declaration, judgment and decree that the fees imposed by the Port on any or all of the Joint Venture-Related Parties constitute a tonnage tax and, as such, the imposition of these fees by the Port violated 46 U.S.C. § 60307;

5.     On the fifth claim for relief, for a declaration, judgment and decree that the fees imposed by the Port on any or all of the Joint Venture-Related Parties constitute an impost on exported goods and thus a restriction on free commerce and navigation, all in violation of the import/export clause of the United States Constitution, Art. I, Section 10, Cl. 2;

6.     On the sixth claim for relief, for a declaration, judgment and decree that the fees imposed by the Port on any or all of the Joint Venture-Related Parties constitute a tonnage tax and, as such, the imposition of these fees by the Port violated the tonnage clause of the United States Constitution, Art. I, Section 10, Cl. 3;

7.     On the seventh claim for relief, for a declaration, judgment and decree that the fees charged by the Port on any or all of the Joint Venture-Related Parties constitute an unlawful taking from the Joint Venture-Related Parties so charged of private property without just compensation in violation of the Organic Act of Guam, 48 U.S.C. §1421b(f), and the Fifth Amendment to the United States Constitution;

8.     On the eighth claim for relief, for a declaration, judgment and decree that the fees charged by the Port on any or all of the Joint Venture-Related Parties constitute an unlawful

deprivation of private property from the Joint Venture-Related Parties so charged without due process in violation of the Fifth and Fourteenth Amendments to the United States Constitution

9. On the ninth claim for relief, for a declaration, judgment and decree that the fees imposed by the Port on any or all of the Joint Venture-Related Parties violated federal common law;

10. On the tenth claim for relief, for a declaration, judgment and decree that the fees imposed by the Port on any or all of the Joint Venture-Related Parties violated the Organic Act of Guam, 48 U.S.C. §1421i(a), because the fees constitute a tax which was not imposed on all taxpayers and the fees constitute a tax which exceeds ten percent (10%) of any or all of the Joint Venture-Related Parties' respective annual income tax liabilities to Guam.

11. On the eleventh claim for relief, for a declaration, judgment and decree that the present dispute is not subject to arbitration, because none the parties involved entered into a contract or agreement to arbitrate;

12. For a preliminary and permanent injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining the Port, its officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from seeking to collect or collecting the charges set forth in Invoice Nos. 74704, 44820, 44821 and 74779 issued to Watts and/or Norton Lilly;

13. For a preliminary and permanent injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining the Port, its officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from seeking to compel by arbitration the enforcement or collection of the charges set forth in Invoice Nos. 74704, 44820, 44821 and 74779 issued to Watts and/or Norton Lilly;

14. For restitution of the $88,808.03 Watts has already paid the Port, plus interest thereon at the maximum rate allowed by law;

1     15.    For Plaintiffs' reasonable costs of suit incurred in prosecuting this action; and

2     16.    For such other and further relief as the Court may deem just and proper.

3     Dated this 15th day of January, 2010.

CALVO & CLARK, LLP
*Attorneys for Plaintiffs*
Watts Constructors, LLC and
Watts-Healy Tibbitts A JV

By: _____
Shane A. Intihar

Exhibit A

MAP COLLECTION
THE GENERAL LIBRARIES
THE UNIVERSITY OF TEXAS AT AUSTIN

AUG 0 2 REC'D

PROPERTY OF U.S. GOVERNMENT



Commercial Port of Guam

November Wharf, Guam Shipyard

SCALE 1:24 000

CONTOUR INTERVAL 20 FEET
SUPPLEMENTARY CONTOUR INTERVAL 10 FEET
DEPTH CURVES AND SOUNDINGS IN FEET DATUM IS MEAN LOWER LOW WATER
THE DISTANCE BETWEEN THE MEAN HIGH WATER AND MEAN LOWER LOW WATER
LINE IS SHOWN AS A NARROW BAND
TO CONVERT FEET TO METERS MULTIPLY BY 0.3048

Produced by the United States Geological Survey
in cooperation with National Imagery and Mapping Agency

THIS MAP COMPLIES WITH NATIONAL MAP ACCURACY STANDARDS
FOR SALE BY U.S. GEOLOGICAL SURVEY, P.O. BOX 25286, DENVER, COLORADO 80225
A FOLDER DESCRIBING TOPOGRAPHIC MAPS AND SYMBOLS IS AVAILABLE ON REQUEST

APRA HARBOR, GU

2000

NIMA 3226 IV NE SERIES V884

Primary highway
hard surface
Secondary highway
hard surface

Light-duty road, hard or
improved surface
Unimproved road

Route Route

G
9215
.S94
.G5
HARBOR
2000
GEL MAP



# Exhibit B



**WATTS**
CONSTRUCTORS

A Weitz Company

November 30, 2009

**VIA HAND DELIVERY:**
Glenn Leon Guerrero
General Manager
**PORT AUTHORITY OF GUAM**
1026 Cabras Highway, Suite 201
Piti, Guam 96925

RE:     **Appeal of Notice of Violation**

Dear Mr. Leon Guerrero:

Pursuant to Section 1.8 of P.L. 26-72, Watts Constructors, LLC ("Watts") and Norton Lilly International, Inc. ("Norton Lilly") appeal the $2,500.00 fine imposed on Norton Lilly pursuant to the notice of violation letter (the "Notice of Violation") sent to Norton Lilly on November 12, 2009.

Although the Notice of Violation states that "Thomas/Barge 401" (which we presume to mean "Thomas / Brusco 401") arrived on Guam on July 31, 2009 and violated Section 5.2 of P.L. 26-72, the Notice of Violation does not explain how the vessel violated the law. (Also, we note that the Notice of Violation failed to inform Norton Lilly of its right to appeal, which itself is a violation of P.L. 26-72). On July 27, 2009, the Port Authority of Guam ("PAG") cleared Thomas / Brusco 401 to enter Apra Harbor as is evidenced by the Declaration and Acceptance of Agencyship executed by PAG which notes the anticipated arrival date of the Thomas / Brusco 401, Voyage 209 as on or about July 30, 2009.

Given that PAG cleared Thomas / Brusco 401, Voyage 209 for entry into Apra Harbor and coupled with the fact that the Notice of Violation offers no explanation as to why PAG assessed the fine, we can only presume that PAG made a mistake in assessing Norton Lilly. If this is not the case, please contact us so that we can respond more particularly to any claimed violation.

We look forward to PAG's response to the issues raised in this letter.

Novato, CA – 77 Digital Dr., Ste 100, 94949, Phone: (415) 382-9930 Fax: (415) 382-9950
Dededo, GU – 674 Harmon Loop Rd., Ste 212, 96929, Phone: (671) 633-4534 Fax: (671) 633-4545
Honolulu, HI – 737 Bishop St., Ste 2900, 96813, Phone: (808) 543-5201 Fax: (808) 543-5208
Gig Harbor, WA – 6625 Wagner Way, Suite 360, 98335, Phone: (253) 853-3311 Fax: (253) 853-3511

Glenn Leon Guerrero
November 30, 2009
Page 2 of 2

Sincerely,

For: Denny Watts
CEO, Watts Constructors, LLC

Cc:     Board of Directors

Exhibit C



November 30, 2009

<u>**VIA HAND DELIVERY:**</u>
Glenn Leon Guerrero
General Manager
**PORT AUTHORITY OF GUAM**
1026 Cabras Highway, Suite 201
Piti, Guam 96925

RE:    <u>Unlawful Tariffs (Set Forth in Invoice Nos. 74704, 44820,</u>
             <u>44821 and 74779) Assessed on Watts Constructors, LLC</u>
             <u>("Watts") by the Port Authority of Guam ("PAG")</u>

Dear Mr. Leon Guerrero:

       This letter is on behalf of Watts to inform you that the above-captioned invoices (the "Invoices") are invalid on account of the fact that PAG imposed them on Watts and/or Watts' agent, Norton Lilly International, without lawful authority to do so, and in any event the charges set forth therein are arbitrary and without any reasonable basis.

       Although Watts paid Invoice No. 74704, allowed PAG to participate in the most recent load-out of Brusco 401 docked at the Guam Shipyard Facility ("GSF"), and thereafter issued a letter of credit in favor of PAG to secure payment of the remaining Invoices, Watts did so only under extreme economic duress imposed by PAG. As you know, PAG unlawfully prevented our vessel, Brusco 401, from entering Apra Harbor and docking at GSF to load U.S. Navy cargo for a U.S. Navy project in Hawaii unless and until Watts paid Invoice No. 74704 and then refused to let the vessel depart GSF to Hawaii with the loaded U.S. Navy cargo unless and until Watts issued a check to cover the remaining Invoices. The check was provided to PAG with the explicit understanding that it would be returned to Watts when Watts provided a letter of credit to cover such Invoices. Watts has provided PAG with such letter of credit.

       None of the actions taken by Watts or its silence should be construed by PAG as Watts' acceptance of PAG's asserted authority to impose charges or tariffs on Watts and/or Norton Lilly International or Watts' concurrence with the Invoices and charges set forth therein. To be clear, Watts rejects any assertion by PAG that it possesses or possessed any authority to impose tariffs on Watts' two most recent cargo shipments (the "Shipments") from GSF or that the charges under the Invoices are valid.

PAG asserts that it has the exclusive authority and right to handle the movement of commercial cargo on Guam. While we understand PAG's position, the law which established PAG, codified as 12 Guam Code Annotated ("GCA") § 10101, *et seq.* in no way establishes PAG as the exclusive commercial port on Guam. In fact, no provision of 12 GCA § 10101, *et seq.* states that vessels must use the Jose D. Leon Guerrero Commercial Port (the "Commercial Port") in order to load or unload cargo in Guam. Instead, 12 GCA § 10101, *et seq.* geographically limits PAG's power to levy tariffs to PAG's port facilities located at Cabras Island and to several named marinas, boat basins and government-owned facilities not at issue here. As such, 12 GCA § 10101, *et seq.* in no way authorized PAG to impose terminal tariffs on Watts and/or Watts' agent, Norton Lilly International, for the Shipments.

The other principal law implicated here is Guam Public Law 26-72, which was enacted by the Guam Legislature in 2001, but was never codified in the GCA. Although PAG has cited to P.L. 26-72 in support of its claim that it is the exclusive commercial port on Guam, nothing in P.L. 26-72 suggests this to be the case. Instead, P.L. 26-72 principally addresses matters concerning safe vessel operation, navigation and customs. In fact, the legislative history of P.L. 26-72 (including testimony given by PAG's former General Manager, Francisco P. Camacho, before the Guam Legislature) indicates that it was enacted merely to update Guam's compulsory pilotage laws to conform with U.S. federal guidelines and that P.L. 26-72 in no way expanded the jurisdiction of PAG to impose tariffs on all vessels in Guam territorial waters. Accordingly, P.L. 26-72 in no way authorized PAG to impose terminal tariffs on Watts and/or Watts' agent, Norton Lilly International, for the Shipments.

Controlling law and regulations clearly state that the Commercial Port's sole source of revenue is derived from terminal tariffs; and nowhere does Guam law state that the Commercial Port's terminal tariffs apply to anywhere but the terminal or wharves of the Commercial Port. Accordingly, under current Guam law, PAG's right to impose tariffs on vessels in Guam extends only to those vessels that choose to use PAG's commercial port terminal and facilities. This, of course, is contrary to PAG's position that PAG is the exclusive commercial port on Guam and that all vessels are subject to its tariffs. PAG's position is legally untenable and relies on a patent misapprehension of controlling law. In particular, PAG has conflated its authority to enforce safety and navigation regulations throughout the territorial waters of Guam with its geographically limited authority to operate the Commercial Port and impose tariffs. In doing so, PAG has now established a monopoly over all commercial port operations on Guam that simply is not countenanced anywhere in the law or regulations of Guam.

PAG had no authority to collect any charges or tariffs (including those set forth in Invoice No. 74704 and subsequent invoices) related to Brusco 401's cargo operations at GSF in July and August of 2009. Moreover, PAG had no authority to prevent a

subsequent voyage of Brusco 401 from entering the inner harbor as a means to compel Watts to pay Invoice No. 74704, as PAG did earlier this month. Additionally, PAG had no authority to prevent Brusco 401 from leaving the inner harbor as a means to compel Watts to permit PAG personnel to assist in the load-out of Brusco 401, as PAG did for the better part of this month. Finally, PAG had no authority to charge Watts for the provision of this labor or to impose any other charges or tariffs related to these operations at GSF.

As noted earlier, Watts paid PAG for Invoice No. 74704 and permitted PAG personnel to assist in the load-out of Brusco 401 and, thereafter, provided PAG with a check in the amount of $924,678.50 which PAG expressly agreed would not be deposited but held as security and later replaced by a letter of credit as a condition to PAG permitting Brusco 401 to leave the inner harbor. Watts provided the check as security to PAG in good faith and Watts has furnished the replacement letter of credit. Although PAG's actions in preventing Brusco 401 from entering the inner harbor and thereafter preventing Brusco 401 from leaving the inner harbor were illegal, Watts capitulated to these demands in order to avoid defaulting under its agreement with the U.S. Navy to timely provide critical U.S. Navy-owned materials to the Submarine Drive-In Magnetic Silencing Facility in Pearl Harbor, Hawaii. As such, all such payments or promises made by Watts in relation to the Shipments were made under economic distress caused by PAG.

Based on PAG's oppressive and unlawful conduct as summarized above, any and all agreements or invoices executed by Watts are void, and all fees or charges paid to PAG by Watts related to the Invoices, are subject to immediate restitution. PAG must return all funds paid by Watts, PAG must return the check in the amount of $924,678.50, and PAG must take immediate steps to release Watts from the letter of credit, and any other obligation Watts was compelled to enter into with PAG. Upon presentation of the letter of credit, Watts cancelled the check which was being held as security by PAG. Any attempt by the PAG to negotiate the referenced check shall be contrary to the explicit understanding and agreement established between the parties.

Additionally, PAG should be aware that Watts is exploring possible claims of defamation against PAG personnel, as well as personnel employed by Guam Customs and Quarantine and members of the Legislature of Guam for disparaging comments made recently in the press. These statements have done serious reputational and economic harm to Watts.

We look forward to PAG's response to the issues raised here.

Sincerely,

*For:* Denny Watts
CEO, Watts Constructors, LLC