| | |
|---|---|
| 1 | EDUARDO A. CALVO |
| | WILLIAM N. HEBERT |
| 2 | SHANE A. INTIHAR |
| | CALVO & CLARK, LLP |
| 3 | 259 Martyr Street, Suite 100 |
| | Hagåtña, Guam 96910 |
| 4 | Tel: (671) 646-9355 |
| | Fax: (671) 646-9403 |
| 5 | |
| 6 | |
| 7 | Attorneys for Plaintiffs |
| | WATTS CONSTRUCTORS, LLC AND |
| | WATTS-HEALY TIBBITTS A JV |
| 8 | |

**IN THE DISTRICT COURT OF GUAM**

**TERRITORY OF GUAM**

| | | |
|---|---|---|
| WATTS CONSTRUCTORS, LLC, an Iowa limited liability company, and WATTS-HEALY TIBBITTS A JV, a joint venture, | | Case No. 10-00002 |
| Plaintiffs, | | |
| v. | | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| PORT AUTHORITY OF GUAM, a Guam public corporation, | | |
| Defendant. | | |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 1

II. STATEMENT OF FACTS ..................................................................................... 2

III. LEGAL STANDARD ............................................................................................ 4

IV. ARGUMENT ......................................................................................................... 5

   A. Plaintiffs' Claims Are Not Barred by Sovereign Immunity ............................... 5
      1. The Port is not immune from Plaintiffs' claims. ........................................... 5
      2. The Port also is not immune when it acts as a market participant. ............... 6

   B. Plaintiffs Are Not Required to Arbitrate their Claims against the Port. ............ 8
      1. Plaintiffs cannot be forced into arbitration without their consent. ................ 8
      2. The Port's arbitration requirement is unlawful. .......................................... 10

   C. Plaintiffs' Second Claim Would Be Futile If Brought in an
      Administrative Adjudication. ........................................................................... 11

   D. Plaintiffs' Tenth Claim Is Colorable and Properly Subject to Declaratory
      Relief. ................................................................................................................ 13
      1. Plaintiffs do not have to allege the taxing authority of the Port. ................ 13
      2. The Court has the authority to grant Plaintiffs declaratory relief. ............. 14

V. CONCLUSION .................................................................................................... 16

i

# TABLE OF AUTHORITIES

**CASES**

*Allen v. Regions Bank*, 654 F. Supp. 2d 523 (S.D. Miss. 2009) ........................................... 9

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................................ 4

*Bank of Am. v. Chaco*, 539 F. 2d 1226 (9th Cir. 1976) ........................................................ 15

*Britton v. Co-op Banking Group*, 916 F. 2d 1405 (9th Cir. 1990) ........................................ 9

*Burgess v. Qwest Corp.*, 546 F. Supp. 2d 1117 (D. Or. 2008) .............................................. 9

*Cannon v. City of New Orleans*, 87 U.S. 577 (1874) ........................................................... 14

*Casamar Guam, Inc. v. Port Authority of Guam*, Civil Case No. CV0240-00 ............ 5, 6, 7, 8

*Clouser v. Espy*, 42 F. 3d 1522 (9th Cir. 1994) ................................................................ 11, 13

*Clyde Mallory Lines v. State of Alabama ex rel. State Docks Commission*,
   296 U.S. 261 (1935) ............................................................................................................ 13

*Collins v. Burlington*, 867 F. 2d 542 (9th Cir. 1989) ........................................................... 10

*Crain v. Government of Guam*, 97 F. Supp. 433 (D.C. Guam 1951) ........................ 2, 5, 14, 15

*Gelow v. Central Pacific Mortg. Corp.*, 560 F. Supp. 2d 972 (E.D. Cal. 2008) ................. 8, 9

*Gilligan v. Jamco Develop. Corp.*, 108 F. 3d 246 (9th Cir. 1997) ......................................... 4

*Johnson v. District Columbia*, 368 F. Supp. 2d 30 (D.C. Cir. 2005) ................................... 10

*Loeffler v. Frank*, 486 U.S. 549 (1988) .................................................................................. 7

*McCarthy v. Madigan*, 503 U.S. 140 (1992) ........................................................................ 10

*Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41 (1938) ............................................. 10

*Opals on Ice Lingeries v. Body Lines, Inc.*, 320 F. 3d 362 (2nd Cir. 2003) ......................... 9

*Plaquemines Port, Harbor and Terminal Dist. v. Federal Maritime
   Com'n*, 838 F. 2d 536 (D.C. Cir. 1988) .......................................................................... 14

*Sanford v. Memberworks, Inc.*, 483 F. 3d 936 (9th Cir. 2007) .............................................. 8

*United States v. Redwood City*, 640 F. 2d 963 (9th Cir. 1981) ............................................. 4

*United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574 (1960) .......... 8, 9

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford
   Junior University*, 489 U.S. 468 (1989) ............................................................................. 8

**STATUTES**

9 U.S.C. § 4 .................................................................................................................. 8

28 U.S.C. § 2201 ............................................................................................ 2, 14, 15, 16

48 U.S.C. § 1421 ................................................................................................ 5, 13, 14

5 GCA § 6102 (2008) ...................................................................................................... 5, 6

5 GCA § 6105 (2008) ...................................................................................................... 5, 6

5 GCA § 9100 (2008) ........................................................................................................ 11

5 GCA § 9240 (2008) ........................................................................................................ 10

5 GCA § 9241 (2008) ........................................................................................................ 11

7 GCA § 42201 (2008) ..................................................................................................... 8, 9

12 GCA § 10101 (2008) ................................................................................................... 7

12 GCA § 10102 (2008) ................................................................................................... 6

12 GCA § 10104 (2008) ................................................................................................... 7

Pub. L. 95-134 (1977) ....................................................................................................... 14

Guam Pub. L. 17-71 (1984) ............................................................................................. 5

Guam Pub. L. 26-72 (2001) ............................................................................... 6, 7, 11, 12, 13

**OTHER AUTHORITIES**

Cong. Research Serv. Summary - H.R. 6550 .............................................................. 15

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 4

# I. INTRODUCTION

Defendant Port Authority of Guam's (the "Port") motion to dismiss Plaintiffs' Complaint is based on two theories that have no merit. Under the first theory, the Port asserts that Plaintiffs' action is barred by sovereign immunity. That theory fails, however, because the Port has waived immunity for "contract-based claims," and the Port itself admitted in its motion that Plaintiffs' claims "arise out of a contract" (Port's MPA: 6:27-28) and "fall squarely within the realm of contract law" (*Id.* at 7:3-4). In addition, the Port is not immune from suit when it acts as a market participant engaged in the "commercial world." Here, the Port acted as a private commercial enterprise by seeking to charge Plaintiffs for alleged cargo-handling services and load-out work pursuant to its "Terminal Tariff." Accordingly, the Port is not immune from suit.

The Port's second theory is that Plaintiffs' Complaint is premature because Plaintiffs have not yet "exhausted their administrative remedies" by first arbitrating their claims against the Port. This theory is groundless for at least two reasons. First, Plaintiffs cannot be forced into arbitration without their consent. Because Plaintiffs have never agreed to arbitrate their claims against the Port, they cannot be compelled to do so. Second, the Port's "administrative remedy" is "final and binding arbitration." This remedy is improper because there is no right to judicial review as required by Guam law. Therefore, the Port's administrative procedure is invalid as a matter of law. Accordingly, the Port's attempt to unilaterally impose arbitration upon Plaintiffs is invalid.

Finally, the Port seeks dismissal of Plaintiffs' Second and Tenth Claims for Relief. With respect to the Second Claim, the Port argues that this Court does not have jurisdiction because Plaintiffs have yet to exhaust their administrative remedies pursuant to the Port's Harbor Rules and Regulations. Although the Harbor Rules and Regulations provide for the administrative adjudication of penalties such as the $2,500 fine imposed on Plaintiffs by the Port, the record adduced in the Complaint demonstrates that it would be futile for Plaintiffs to seek relief in a hearing before the Port's board of directors. Accordingly, Plaintiffs are not required to exhaust their administrative remedies. With respect to the Tenth Claim, the Port argues that the

1

"Federal taxes" exception bars this Court from granting Plaintiffs the declaratory relief they seek pursuant to 28 U.S.C. § 2201. The Port's argument rests on a misreading of this Court's decision in *Crain v. Government of Guam*, 97 F. Supp. 433 (D.C. Guam 1951). The Tenth Claim does not implicate the "Federal taxes" exception, and this Court is authorized to grant the declaratory relief requested therein.

Based on the foregoing, the Port's motion to dismiss completely lacks merit, and the Court should deny it in its entirety.

## II.     STATEMENT OF FACTS

Plaintiff Watts Constructors, LLC ("Watts") is a contractor licensed to do business in Guam. (Compl. ¶ 2.) Plaintiff Watts-Healy Tibbitts A JV is a joint venture governed by the laws of Delaware ("Joint Venture"). (Compl. ¶ 3.) Watts and Healy Tibbitts are the sole members of the Joint Venture. *Id*. The Port is a public corporation and autonomous instrumentality of the government of Guam. (Compl. ¶ 4.)

In August 2008, the Joint Venture entered into a contract with the Department of Defense to construct a submarine facility for the U.S. Navy in Pearl Harbor, Hawaii. (Compl. ¶ 9.) During the course of construction, the Joint Venture sought to transport certain construction materials from Guam to the Hawaii construction site in two shipments. *Id*. The Joint Venture selected the November wharf located at the Guam Shipyard to use to conduct the load-out of the construction materials. (Compl. ¶ 15.) The Guam Shipyard is a private facility that subleases the November wharf from the Guam Economic Development Authority, which leases the property from the U.S. Navy. (Compl. ¶ 16.) The November wharf is located in Apra Inner Harbor. *Id*. The Port does not own or control any facilities inside Apra Inner Harbor. *Id*.

On July 30, 2009, the tug and barge used for the first shipment arrived offshore of Guam. (Compl. ¶ 18.) The next day, after clearing customs, they proceeded to the November wharf. *Id*. By August 12, 2009, all cargo was loaded onto the barge. *Id*. After being cleared for departure by the Guam Customs and Quarantine Agency, the tug and barge set sail for Pearl Harbor on August 14, 2009. *Id*. They arrived safely to Hawaii and delivered the construction materials and then returned to Guam to pick up the second shipment. *Id*.

On November 2, 2009, the tug and barge arrived offshore of Guam, but surprisingly, the Port refused to allow the vessels to pass through Apra Harbor in order to enter Apra Inner Harbor and receive the cargo at the Guam Shipyard. (Compl. ¶ 19.) Even though the Port had no involvement in the first load-out, it demanded the Joint Venture pay it $88,808.03 or else it would not be allowed to pick up the second load. (Compl. ¶ 20.) The Joint Venture had no other choice but to pay the Port the full amount so its barge could access Apra Inner Harbor and receive the waiting cargo. (Compl. ¶ 21.) The Joint Venture was forced to pay that amount because it was facing the imposition of liquidated damages from the U.S. Navy arising from the delay caused by the Port in the shipment of the second load. *Id.* On November 6, 2009, with its back against the wall, the Joint Venture paid the Port $88,808.03. (Compl. ¶ 22.) However, the Joint Venture filed a written notice vehemently protesting the Port's unlawful assessment of these charges. (Compl. ¶ 31.)

In addition to imposing the retroactive assessment on the first load, the Port further forced the Joint Venture to accept an arrangement whereby the Port would permit the Joint Venture to load the barge at the Guam Shipyard but would require the Joint Venture to permit Port personnel to participate in the load-out. (Compl. ¶ 23.) The Joint Venture accepted this arrangement under protest. (Compl. ¶ 23, 31.) Thereafter, on November 9, 2009, the Port allowed the tug and barge to pass through Apra Harbor to Apra Inner Harbor and dock at the Guam Shipyard in preparation for loading. (Compl. ¶ 23.)

On November 23-24, 2009, the Port issued three invoices to the Joint Venture's shipping agent for $927,178.50 covering both shipments. (Compl. ¶ 25.) This amount included a $2,500 "fine" the Port assessed against the Joint Venture's shipping agent for an alleged violation that never occurred. (Compl. ¶ 24.) The Port refused to permit the Joint Venture's vessels to pass out of Apra Harbor until the Joint Venture paid the full amount of the invoices to the Port. (Compl. ¶ 26.) Making matters even worse, Typhoon Nida was at that time quickly approaching Guam, threatening to delay the shipments if the tug and barge did not depart immediately. (Compl. ¶ 27.) The Joint Venture therefore was forced (again) to pay the Port to

obtain the release of its vessels in order to avoid defaulting on a major U.S. Navy contract and to allow the vessels to depart Guam prior to the landfall of Typhoon Nida. (Compl. ¶ 28.)

On November 30, 2009, Plaintiffs appealed the Notice of Violation and fine issued to its shipping agent on November 12, 2009. (Compl. ¶ 30, Ex. B.) On the same day, Watts submitted a written protest and notice of dispute regarding the unlawful tariffs assessed on its shipping agent by the Port. (Compl. ¶ 31, Ex. C.) Plaintiffs expressly asserted that "any and all agreements or invoices executed by Watts are void. . . ." (Compl., Ex. C.) The Port subsequently denied Plaintiffs' claims.

On January 15, 2010, Plaintiffs filed the present Complaint seeking restitution of the amounts paid and a declaration that, among other things, "none of the Joint Venture-Related Parties ever promised or agreed to use the Port's facilities for the first load-out occurring in July-August 2009 and, accordingly, if the Port set aside wharf-side space for staging the pre-cast concrete materials and held ready Port-employed stevedores to conduct the load-out, the Port acted unreasonably and without justification, and none of the Joint Venture-Related Parties has any legal duty to reimburse the Port for any costs it incurred or any revenue it has foregone." (Compl. – Prayer for Relief ¶ 3.) Plaintiffs further sought a declaration that "the present dispute is not subject to arbitration, because none the parties involved entered into a contract or agreement to arbitrate." (*Id.* ¶ 11.)

### III. LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims in the complaint. FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face [citations]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). However, "the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Gilligan v. Jamco Develop. Corp.*, 108 F. 3d 246, 249 (9th Cir. 1997). Moreover, a 12(b)(6) dismissal is proper only in "extraordinary" cases. *United States v. Redwood City*, 640 F. 2d 963, 966 (9th Cir. 1981).

## IV. ARGUMENT

### A. Plaintiffs' Claims Are Not Barred by Sovereign Immunity

#### 1. The Port is not immune from Plaintiffs' claims

The government of Guam possesses sovereign immunity and is therefore "immune from suit without its consent." *Crain, supra*, 97 F. Supp. at 434.; 48 U.S.C. § 1421 *et seq*. When the Port was established, however, it expressly waived its immunity from suit: "There is hereby established the Port Authority of Guam as a public corporation and autonomous instrumentality of the government of Guam. . . . The Authority shall have perpetual succession unless sooner terminated by law and shall adopt a seal and [shall sue and be] sued in its own Corporate name."[1] 12 GCA § 10102 (2008) (emphasis added). However, the subsequent enactment of the Government Claims Act reigned in the broad waiver of immunity conferred by the Port's enabling legislation by providing that autonomous agencies like the Port only waive immunity for contract and tort-based claims. 5 GCA §§ 6102, 6105 (2008).

Although the Port readily concedes that Plaintiffs' claims are contract based ("Plaintiffs' claims arise out of a contract," Port's MPA: 6:27-28, "these claims fall squarely within the realm of contract law," Port's MPA, 7:3-4), it nevertheless argues that Plaintiffs' claims do not fit within one of the Government Claims Act's waiver provisions. The Port is plainly wrong. The waiver provisions extend to "contract-based claims," not claims solely limited to "expenses incurred in reliance upon a contract," as the Port argues. In *Casamar Guam, Inc. v. Port Authority of Guam*, Civil Case No. CV0240-00, *Decision and Order on Motion for Temporary Restraining Order* (Feb. 24, 2000), plaintiff Casamar sued the Port for declaratory and injunctive relief arising out of a lease they had entered into. Plaintiff filed a motion for a temporary restraining order against the Port to enjoin it from "prohibiting or restricting Casamar's operations regarding the transshipment of fish and to enjoin the Port from imposing a wharfage fee on vessels docking at the Casamar wharf." *Id.* at 2. Similar to here, the Port

---

[1] A transcription error resulted in the bracketed language being inadvertently omitted from the statute. *See* Guam Pub. L. 17-71 (1984), § 3 for the full text of the subsection including the text omitted by the Compiler.

5

argued that it was immune from suit and therefore the court lacked subject matter jurisdiction to entertain the motion. *Id.* at 4. The court flatly disagreed. The court held that plaintiff's "case against the Port can be characterized as a contract based claim," and because "the Port is a party to the contract, it appears clear to this Court that § 6105(a) applies and the Port is deemed to have waived immunity." *Id.* at 6.

*Casamar* is instructive here. Similar to the plaintiff in that case, Plaintiffs also have filed a complaint for declaratory and injunctive relief against the Port, disputing, among other things, the Port's right to "impos[e] a wharfage fee on vessels docking at a [private] wharf." *Casamar, supra*, CV0240-00 at 2. There is no doubt that Plaintiffs' claims are "contract-based" (as the Port concedes), even though Plaintiffs contend the "agreements" they entered into with the Port are invalid. (Compl. ¶¶ 41, 47-48, 88-91 and Ex. C; *see also* Compl. – Prayer for Relief ¶¶ 1, 3, 11.) In particular, Plaintiffs are seeking the return of money they paid pursuant to an agreement which they contend is void or under which they were induced by duress to enter into. *Id.* Further, it is undisputed that the "Port is a party to the contract." *See Casamar, supra*, CV0240-00 at 6. Accordingly, the Port is not immune from suit, and Plaintiffs are entitled to prosecute their claims against it.

### 2. The Port also is not immune when it acts as a market participant.

The Port is "a public corporation and autonomous instrumentality" of Guam. 12 GCA §10102 (2008). As such, the Port operates in two separate capacities. On the one hand, the Port administers and enforces the Harbor Rules and Regulations "to ensure the safe and efficient operation of vessels within Apra Harbor and all Guam waters within the Harbor Master's [i.e. the designated representative of the Port] jurisdiction." Amended Harbor Rules and Regulations for the Port Authority of Guam, Guam Pub. L. 26-72, § 2.17 (2001). Under a different law, the Port acts as the commercial operator of the Jose D. Leon Guerrero Commercial Port on Cabras

Island (the "Commercial Port"), Agaña Boat Basin (Gregorio D. Perez Marina), Agat Marina and the Port's other commercial facilities located on Cabras Island.[2]

When the Port is engaged in commercial operations (e.g., entering into contracts in its own name to provide labor services), it operates as a *market participant*, similar to other private commercial enterprises. Moreover, like a commercial enterprise, when the Port enters into contracts pursuant to its "Terminal Tariff" rules, the Port requires that any disputes arising under those contracts be subject to "final and binding arbitration."[3] *See Terminal Tariff, Board Policy Memorandum* Nos. 2002-09 & 2002-10. This form of dispute resolution is typical of *private parties*.

On the other hand, when the Port is performing, "harbor control and compliance," (e.g., acting as "harbor cop" by enforcing safety and navigation rules) it is operating as a *government agency*. *See* P.L. 26-72. And when the Port is acting as harbor cop, it utilizes an administrative adjudication process that is typical of the way other governmental agencies handle claims asserted against them. *Id.* at § 1.10.

This distinction is significant because when the Port is acting as a *market participant*, it is not immune from suit. In *Casamar Guam, Inc. v. Port Authority of Guam*, the court held that "since the Port's actions were pursuant to the express terms of the lease, it can be said that the Port was acting in its capacity as a landlord and not as a government agency. As such, <u>the Port's governmental immunity would not apply</u>." *Casamar, supra*, CV0240-00 at 6 (citing *Yarborough v. Sealand Services, Inc.*, USDC Guam, 94-73 (1997)) (emphasis added); *see also Loeffler v. Frank*, 486 U.S. 549, 555-56 (1988) ("By launching 'the Postal Service into the commercial world,' and including a sue-and-be-sued clause in its charter, Congress has cast off the Service's 'cloak of sovereignty' and given it the 'status of a private commercial enterprise.'"). Here, the

---

[2] Pursuant to 12 GCA § 10104(d) (2008), the Board of Directors of the Port oversees "the maintenance and operation of the port facilities." Pursuant to 12 GCA § 10101(d) (2008), "*Port* means the Civil Port, small boat marinas [e.g. Agat Marina], and all related facilities of the territory of Guam located on Cabras Island, Apra Harbor, Agana Boat Basin [renamed Gregorio D. Perez Marina], and all other Government of Guam small boat marinas."

[3] Plaintiffs dispute the validity of the Port's arbitration requirement. *See, infra*, Section IV.B.

7

Port similarly was not acting "as a government agency," but as a "private commercial enterprise" in the "commercial world." Accordingly, "the Port's governmental immunity would not apply." *Casamar, supra*, CV0240-00 at 6. The Port's motion therefore lacks merit and should be denied.

### B. Plaintiffs Are Not Required to Arbitrate their Claims against the Port.

#### 1. Plaintiffs cannot be forced into arbitration without their consent.

The Port's attempt to force Plaintiffs into arbitration is further improper because Plaintiffs never agreed to arbitration. Plaintiffs allege that the only reference to arbitration is set forth in the Port's 2002 Policy Memorandum, which the Port now seeks to unilaterally impose on Plaintiffs. The Policy Memorandum is not a consensual agreement between Plaintiffs and the Port and therefore Plaintiffs and the Port never entered into any agreement to arbitrate. (Compl. ¶¶ 88-91.) The Port has not presented any facts or arguments to the contrary. Taking Plaintiffs' allegations as true, as the Court must, there was never any agreement among the parties to arbitrate any disputes.

To allow the Port to unilaterally impose arbitration on Plaintiffs without their consent would be contrary to well-established law holding that "<u>arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit</u>." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) (emphasis added); *see also Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 469 (1989) ("Arbitration . . . is a matter of consent, not coercion."). As a result, when one party disputes the making of the arbitration agreement, the Federal Arbitration Act requires that "the court [ ] proceed summarily to the trial thereof" before compelling arbitration under the agreement. 9 U.S.C. § 4. This language encompasses challenges to the making of the contract containing the arbitration clause. *See Sanford v. Memberworks, Inc.*, 483 F. 3d 956, 962 (9th Cir. 2007) (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F. 2d 1136, 1140-41 (9th Cir. 1991)).

The party seeking to enforce an arbitration agreement bears the burden of showing that the agreement exists and that its terms bind the other party. *Gelow v. Central Pacific Mortg. Corp.*, 560 F. Supp. 2d 972, 978 (E.D. Cal. 2008); *see also* 7 GCA § 42201 [Guam's civil

8

| | |
|---|---|
| 1 | arbitration law] (defining an arbitration agreement as "an agreement by the parties to submit to |
| 2 | arbitration all or certain disputes which have arisen or which may arise between them in respect |
| 3 | of a defined legal relationship" and providing that "[t]he arbitration agreement shall be in |
| 4 | writing. An agreement is in writing if it is contained in a document signed by the parties . . . .") |
| 5 | In sum, "[t]he right to compel arbitration derives from a contractual right . . . ." *Britton v. Co-op* |
| 6 | *Banking Group*, 916 F. 2d 1405, 1413 (9th Cir. 1990). "When we are asked to compel |
| 7 | arbitration of a dispute, our threshold inquiry is whether the parties agreed to arbitrate." *Id.* at n. |
| 8 | 9. Where the party seeking to compel arbitration cannot establish by a preponderance of the |
| 9 | evidence an agreement to arbitrate, the courts will not compel arbitration under the Federal |
| 10 | Arbitration Act. *See, e.g., Opals on Ice Lingeries v. Body Lines, Inc.*, 320 F. 3d 362, 371-72 |
| 11 | (2nd Cir. 2003) (no meeting of the minds forming an agreement to arbitrate where only one party |
| 12 | signed the addendum containing the arbitration clause); *Burgess v. Qwest Corp.*, 546 F. Supp. 2d |
| 13 | 1117, 1121-1122 (D. Or. 2008) (where defendant failed to demonstrate that plaintiff had been |
| 14 | made aware of arbitration provision in Internet and wireless agreements, the court found that no |
| 15 | agreement to arbitrate existed and would not compel arbitration of dispute); *Allen v. Regions* |
| 16 | *Bank*, 654 F. Supp. 2d 523, 529 (S.D. Miss. 2009) (arbitration clause in customer deposit |
| 17 | agreement did not require arbitration of disputes under separate loan agreement between the |
| 18 | same parties); *Gelow, supra*, 560 F. Supp. 2d at 979 (given disputed evidence that employer |
| 19 | signed arbitration agreements with employees, court would not compel arbitration). |
| 20 | It is undisputed that Plaintiffs never agreed to arbitrate their claims against the Port. It is |
| 21 | also undisputed that the parties never entered into a written agreement to submit their dispute to |
| 22 | arbitration. The Port's 2002 Policy Memorandum, which compels arbitration on any "party |
| 23 | dissatisfied with the denial or deemed denial by the Port Authority of a dispute," clearly is not |
| 24 | "consensual" and does not constitute an agreement by the parties to submit to arbitration. 7 |
| 25 | GCA § 42201 (2008); *United Steelworkers of America, supra*, 363 U.S. at 582. There is no |
| 26 | evidence that Plaintiffs ever saw the Port's 2002 Policy Memorandum before the Port imposed |
| 27 | its charges, or that the Plaintiffs ever agreed to arbitration under the Port's 2002 Policy |
| 28 | |

9

Case 1:10-cv-00002 Document 16 Filed 03/08/10 Page 13 of 20

Memorandum. There was no binding agreement to arbitrate and Plaintiffs are entitled to litigate their claims in court. Accordingly, the Court should deny the Port's motion in its entirety.

### 2. The Port's arbitration requirement is unlawful.

The Port next argues that Plaintiffs' complaint should be dismissed because Plaintiffs have not "exhausted the administrative remedies" available to them. In particular, the Port declares that "Plaintiffs' complaint should be dismissed **until** they complete the procedure that provides them the opportunity to resolve their dispute." Port's MPA, 9:18-19 (emphasis added). By "procedure," the Port means binding and non-reviewable arbitration. *See id.* at 8; *see also Terminal Tariff, Board Policy Memorandum* Nos. 2002-09 & 2002-10. Notwithstanding the Port's implicit concession here that it lacks immunity against Plaintiffs' suit, the Port's argument is still fatally flawed. If Plaintiffs actually were to comply with the Port's "procedure," they would **not** be entitled to judicial review or have their complaint eventually reinstated (as the Port suggests). This is because under the Port's rules, arbitration is the end of the road for Plaintiffs: the court is only authorized to "confirm" the award, not review the award on its merits or otherwise permit Plaintiffs to re-adjudicate their claims. *Id.* As such, the cases on which the Port relies to support its "exhaustion of administrative remedies" argument are inapposite. For example, the Port cites *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41 (1938) for the proposition that a party is "[not] entitled to judicial relief" **until** it has exhausted the "prescribed administrative remedy." (Emphasis added.) The Port also cites *McCarthy v. Madigan*, 503 U.S. 140 (1992) to make the same point: "This court long has acknowledged the general rule that parties exhaust prescribed administrative remedies **before** seeking relief from the federal courts."[4] (Emphasis added.) These cases, however, are distinguishable because Plaintiffs do not have a right to judicial review here as required in those cases and by Guam law: "Judicial review may be had of any agency decision by any party affected adversely by it."

---

[4] The Port's reliance upon *Johnson v. District Columbia*, 368 F. Supp. 2d 30 (D.C. Cir. 2005) and *Collins v. Burlington*, 867 F. 2d 542 (9th Cir. 1989) is misplaced for the same reason that judicial review was available to the plaintiffs in those cases following their exhaustion of the administrative process. Those cases also involved an agreement to arbitrate.

10

5 GCA § 9240 (2008) (emphasis added). Therefore, the Port's administrative procedure (i.e., binding and non-reviewable arbitration) is invalid as a matter of law. Accordingly, the Port's "exhaustion of administrative remedies" argument is without merit, and Plaintiffs should not be compelled to arbitrate their claims against the Port.

### C. Plaintiffs' Second Claim Would Be Futile If Brought in an Administrative Adjudication.

The Plaintiffs acknowledge that the "Harbor Rules and Regulations provide a specific mechanism [i.e. administrative adjudication pursuant to 5 GCA § 9100, *et seq.*] for resolving contested cases." Port's MPA, 12:12-13. This, again, is consistent with dual function of the Port. Parties that choose to off-load cargo or passengers using the Commercial Port's facilities and personnel are, according to the Port's Policy Memorandum 2002-09, subject to binding (non-reviewable) arbitration in the case of a dispute with the Port. On the other hand, parties that are subject to the unilateral imposition of civil and criminal penalties by the Port through its police powers, although required to appeal such penalties through an administrative adjudication, are afforded recourse to the courts through an elective appeal process. P.L. 26-72, §§ 1.7-1.10; 5 GCA § 9241 (2008).

Plaintiffs, nevertheless, filed for declaratory relief in this Court because it would be futile for them to contest the fine imposed on Norton Lilly through the Port's administrative adjudication process. It is clear from record that the Port imposed the $2,500 fine on Norton Lilly not because it believed that Plaintiffs violated § 5.2 of P.L. 26-72, but rather to penalize Plaintiffs for choosing to do business with Guam Shipyard instead of the Commercial Port and to discourage Plaintiffs from resisting the Port's attempt to impose fees on them. Given this brazen abuse of power and the conflicted position of the Port's board of directors as adjudicators over this claim, it would be utterly futile for Plaintiffs to seek redress through an administrative adjudication. *Clouser v. Espy*, 42 F. 3d 1522, 1532-33 (9th Cir. 1994) ("there is no requirement of exhaustion where resort to the agency would be futile. [W]here the agency's position on the question at issue 'appears already set,' and it is 'very likely' what the result of recourse to

administrative remedies would be, such recourse would be futile and is not required.'") (citing *SAIF Corp./Oregon Ship v. Johnson,* 908 F. 2d 1434, 1441 (9th Cir.1990)).

Several points relating to delivery of the Notice of Violation suggest that the Port imposed the $2,500 fine on Norton Lilly without any regard for the law governing the imposition of such fines and, instead, was motivated by its desire to penalize Plaintiffs for refusing to use the Commercial Port.

First, although the Notice of Violation asserted that the THOMAS and BRUSCO 401 violated § 5.2 of P.L. 26-72 on July 31, 2009, the Port did not deliver the Notice of Violation to Norton Lilly until November 12, 2009, or 104 days after the occurrence of the purported violation. (Compl. ¶ 24.) This is in spite of the fact that under the Port's own Harbor Rules and Regulations "[n]o penalty may be assessed more than sixty (60) days after the date of the Port Manager's receipt of a written complaint" and all complaints must be "submitted to the Port Manager within thirty (30) days of the date the conduct complained of was first discovered." P.L. 26-72, §§ 1.8.

Given that the Port controls ingress and egress to and from Apra Harbor, the Port would have been aware of any unpermitted entry by the THOMAS and BRUSCO 401 into Apra Harbor, if such violation actually occurred, on July 31.[5] Thus, not only did the Port deliver the Notice of Violation 104 days after the date of the alleged violation (and thus, at the time Plaintiffs were wrangling with the Port over the fees it was attempting to impose on them), but the Port did so in contravention of its own Harbor Rules and Regulations.

Second, the Port issued the Notice of Violation to Norton Lilly in spite of the fact that the Port authorized the THOMAS and BRUSCO 401 to enter into Apra Harbor on July 27, 2009

---

[5] It should be noted that the Notice of Violation does not actually specify the violation allegedly committed by Plaintiffs. Instead, the Notice of Violation simply quotes all of P.L. 26-72, § 5.2, which establishes grounds for several different violations. This omission violates P.L. 26-72, § 1.8, which requires that the Port provide written notice explaining the grounds for the assessment of any penalty. Nevertheless, because the Notice of Violation states that Plaintiffs violated section 5.2 on July 31, i.e. the date of their entry into Apra Harbor, Plaintiffs deduce as their alleged violation an unpermitted entry into Apra Harbor.

12

when the Port executed the Declaration and Acceptance of Agencyship submitted by Norton Lilly. (Compl. ¶¶ 17, 24.)

Third, the Notice of Violation fails to note the assessee's right to appeal the penalty as required under P.L. 26-72, § 1.8.

It is clear from the face of Plaintiffs' Complaint and controlling law that the Port issued the Notice of Violation to Norton Lilly without regard to Plaintiffs' procedural rights and the Port's own regulations. The facts and circumstances adduced in the Complaint show that the Port abused its police powers as administrator of the Harbor Rules and Regulations in order to penalize Plaintiffs for not contracting with the Commercial Port and to dissuade Plaintiffs from continued recalcitrance. As such, any attempt by Plaintiffs to obtain a fair hearing before the Port's board of directors would be futile and thus under controlling law is not required. *Clouser, supra*, 42 F. 3d at 1532-33. For this reason, the Port's claim that Plaintiffs must first exhaust their administrative remedies before proceeding with their Complaint lacks merit. Accordingly, Plaintiffs Second Claim for Relief is properly before the Court.

### D. Plaintiffs' Tenth Claim Is Colorable and Properly Subject to Declaratory Relief.

#### 1. Plaintiffs do not have to allege the taxing authority of the Port.

In response to Plaintiffs' Tenth Claim – that the fees that the Port imposed upon Plaintiffs constitute a tax in violation of 48 U.S.C. § 1421i(a) – the Port asserts that the "claim is without merit because the Port has never had anything to do with establishing, collecting, or assessing any taxes." Port's MPA: 13:5-7. The Port, however, does not (and cannot) cite to any authority which recognizes such assertion as a required element of a colorable claim.

Plaintiffs do not contend that the Port has the authority to levy taxes. This does not, however, preclude Plaintiffs from asserting a claim that the fees imposed by the Port constitute taxes in abrogation of 48 U.S.C. § 1421i(a). Instead, the Federal Reporters are replete with "cases in which a tax, levied [by a municipality] in the guise of wharfage or a charge for medical inspection, was condemned because imposed on all vessels entering a port, whether receiving the benefit of the service or not." *Clyde Mallory Lines v. State of Alabama ex rel. State Docks*

13

*Commission*, 296 U.S. 261, 266 (1935); *Cannon v. City of New Orleans*, 87 U.S. 577, 581 (1874); *Plaquemines Port, Harbor and Terminal Dist. v. Federal Maritime Com'n*, 838 F. 2d 536, 545 (D.C. Cir. 1988).

Thus, Plaintiffs need not assert that the Port has the authority to impose the taxes prescribed under 48 U.S.C. § 1421i(a) in order to state a valid claim. Rather, as in the cases cited above, Plaintiffs need only assert that the Port has imposed a fee that constitutes a tax which, irrespective of whether the Port has the authority to impose it, is prohibited by controlling law, (in this case, 48 U.S.C. § 1421i(a)).

### 2. The Court has the authority to grant Plaintiffs declaratory relief.

As its second basis for dismissal, the Port argues that the "Federal taxes" exception to 28 U.S.C. § 2201 strips this Court of its authority to grant the declaratory relief sought by Plaintiffs in their Tenth Claim. Again, the Port is wrong. The "Federal taxes" exception is not implicated by the laws or facts *sub judice* and in no ways limits this Court's power to grant the declaratory relief sought by Plaintiffs. The Port's view to the contrary rests on its misreading of this Court's decision in *Crain v. Government of Guam*, 97 F. Supp. 433 (D.C. Guam 1951), discussed in detail below.

Section 1421i(a) authorizes the Government of Guam to impose two classes of tax. The first is the Guam Territorial Income Tax ("GTIT"), which is an income tax that mirrors the Federal "income-tax laws in force in the United States." The second is a local tax regime of Guam's own devising. Congress authorized this second tax regime twenty-six years after the creation of the GTIT. In 1977, Congress amended Section 1421(a)

> by changing the period at the end of section 31 (a) // 48 USC 1421; // to a colon and inserting the following: 'Provided, That notwithstanding any other provision of law, the Legislature of Guam may levy a separate tax on all taxpayers in an amount not to exceed 10 per centum of their annual income tax obligation to the Government of Guam.'

14

Pub. L. 95-134, Section 203(c) (1977); *see also* Congressional Research Service Summary for H.R. 6550 (Pub. L. 95-134 "[e]mpowers the Legislature of Guam to levy a separate tax on all taxpayers not to exceed ten percent on all annual income tax obligations.").[6]

Thus, Congress granted the Guam legislature the power to impose a separate, albeit much smaller, tax, in addition to the GTIT established under the Organic Act in its original form. Examples of such taxes in force on Guam today include the Business Privilege and Gross Receipts Taxes. It is this second tax provision, which is "in addition to the income tax already levied on Guam," that Plaintiffs allege the Port to have violated. (Compl. ¶ 81). (*See also id.* at ¶ 84) ("This tax exceeds ten percent (10%) of any or all of the Joint Venture-Related Parties' respective annual income tax liabilities to Guam.")

Accordingly, the Port's reliance on *Crain v. Government of Guam* is totally misplaced. *Crain* addressed an important, and at the time intriguing, question, which nonetheless has no bearing whatsoever on this case: Given that 28 U.S.C. § 2201 explicitly excepts most Federal tax questions from the authority it grants Federal district courts to grant declaratory relief, what does this mean for parties challenging the imposition of the GTIT which, of course, simply mirrors the Internal Revenue Code ("IRC")?

In response, this Court explained that section 31 of the Organic Act (which at the time included only the GTIT) must be construed in relation to the "applicable provisions of the United States Internal Revenue Code, 26 U.S.C.A. § 1 et seq.; [and] that any tax imposed by Sec. 31 is the concern of the United States Government and not the Government of Guam." *Crain, supra*, 97 F. Supp. at 434. And thus, this Court held the exception to the Federal courts' power to grant declaratory relief in Federal tax matters extended to parallel claims under the GTIT. *Id., see also Bank of Am. v. Chaco*, 539 F. 2d 1226, 1227-1228 (9th Cir. 1976) (explaining that section 31 was enacted in order to "relieve the United States Treasury of the necessity of making direct appropriations" to Guam and thus the GTIT is, in effect, a Federal tax in contrast to the Business Privilege Tax which is imposed by Guam).

---

[6] *At* http://thomas.loc.gov/cgi-bin/bdquery/z?d095:HR06550:@@@D&summ2=m&|TOM:/bss/d095query.html|

Of course, the second clause of Section 1421i(a), which was enacted twenty-six years after this Court rendered it decision in *Cain,* has no relationship whatsoever to the IRC or Federal tax law. It merely allows for the imposition of a local tax, such as an ad valorem tax or personal property tax, not unlike those imposed by states and municipalities throughout the United States. Accordingly, even under the rationale stated in *Crain*, claims arising out of the imposition of the second clause of Section 1421i(a), because the second clause is in no way related to or modeled after any Federal law, would be subject to this Court's declaratory powers. Thus, the exception relating to Federal tax matters contained in 28 U.S.C. § 2201 in no ways stands as a barrier to the declaratory relief sought here by Plaintiffs.

## V. CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court deny the Port's motion to dismiss in its entirety.

Dated this 8th day of March, 2010.

          CALVO & CLARK, LLP
          Attorneys for Plaintiffs
          Watts Constructors, LLC and
          Watts Healy Tibbitts A JV

By: _____
     SHANE A. INTIHAR

16